for the Court is now sitting. God save the United States and this Honorable Court. Case number 19-5212, Association for Community Affiliated Plans et al., Appellant, v. United States Department of the Treasury et al., Mr. Rothfeld for the Appellants, Mr. Winnick for the Appellees. If attorneys would please introduce themselves before they speak. This is Charles Rothfeld for the Appellants. Mayor Brown. May it please the Court, this is Charles Rothfeld. And please, Your Honors, if you have difficulty hearing me, let me know. It's a novel experience for all of us. We are here to challenge the short-term implementation rule. That rule goes a long way towards dismantling the Affordable Care Act. The rule assures that the ACA will not operate as Congress intended. It misunderstands and misapplies the language of the statute that it purports to interpret. And it is, in addition, arbitrary and capricious in a number of respects.  Each of them independently require invalidation of the rule. First, the rule is premised on a counterfactual understanding of the language and operation of the ACA. Congress enacted the ACA with particular goals in mind, and it wanted to accomplish those goals in a particular way. The goals were to assure that the largest possible number of people... Mr. Rothfeld, when Congress enacted, this is Judge Griffith, when Congress enacted the ACA, didn't they adopt the definition of this short-term limited duration rule that we effectively have now? I think they did not adopt that definition, Your Honor. The definition had been promulgated by a regulation in 1997. At the time the ACA was enacted, incorporating a reference with short-term disability, short-term limited duration meant under HIPAA, right? It incorporated that by reference. That's correct? Well, it incorporated the exception from the definition of individual health insurance. And that term had been given meaning by regulations at that time, right? So when Congress used that phrase, it came with some history and some meaning that had been given by regulation. Is that correct? Well, I... Is that correct? Yes or no? Is that correct? Yes or no? There had been regulations issued prior to the enactment of the ACA that gave the department's agencies interpretation of what the phrase short-term limited duration meant. Is that correct? That is correct, Your Honor. Okay. And the meaning that the agencies had given to that rule, to that concept at the time, how is that meaningfully different than the rule you're challenging today? I think it is substantially similar to that interpretation. But I would have reason to say, Your Honor, that I think that the ratification doctrine, which the government relies on very heavily, I think simply has no application in the context here. Why is that the case? This court and the Supreme Court have both said repeatedly that the ratification doctrine rests on the understanding that Congress was familiar with the regulation that it is purporting to have ratified. And if Congress was not familiar with the regulation, if there's no reason to believe that Congress... How long had that regulation existed at the time the ACA was enacted? It had existed for 13 years, Your Honor. And you're saying Congress was unaware of the meaning that had been given to that term by the agencies? I am saying that, Your Honor. And what's your evidence for that? What's your evidence? Why should we... I mean, there are all sorts of canons that we presume that Congress knows what the law is. And it's enacting this phrase from another statute that had been given meaning by the agencies. It seems to me you have a very heavy burden to show that Congress didn't intend to do what Congress actually did. Well, I guess I would disagree that Congress actually did ratify... No, you just told me what they did. What they did is they used a statutory phrase from HIPAA. They put that in the ACA. And that statutory phrase had been given meaning and interpreted by agencies for, I think you said, over 10 years. That's what they did. They put that in the ACA. Now, you have to explain to me why they didn't intend to bring the meaning that the agencies had given had long been established with it. I guess that's the problem I'm having. Well, let me give you two points in response to that, Your Honor. First, the legal point. And second point regarding this regulation in particular. The legal point is that, as the Supreme Court and this court have both said,  and perhaps have been on the books for quite a long time, absent some clear reason to believe that Congress was aware of that regulation, the ratification doctrine doesn't apply. And I'll just read what the Supreme Court said in the Brown v. Gardner case, which we quote in our briefs. And I'm quoting the Supreme Court. The record of congressional discussion preceding reenactment makes no reference to the VA regulation. There is no other evidence to suggest that Congress was even aware of the VA's interpretive position. In such circumstances, we consider the reenactment to be without significance. So I think that there has to be some indication that Congress, in fact, was aware of the regulation for ratification to apply. Here, the short-term limit duration regulation promulgated in 1997 was involving a rule that had received essentially no attention by anybody in Congress or in the broader community. When the regulation was promulgated in 1997, it was of such little significance that the agencies did not explain why they adopted that definition. They said nothing about it. When they adopted the final rule that incorporated the same definition in 2004, they gave no explanation. The regulation received absolutely no comments, zero comments. It was a niche consideration in the health insurance market at the time that it received essentially no attention. When Congress considered the ACA in 2010, the short-term limit duration insurance does not appear in the text of the statute at all. And so far as we've been able to determine, it was not mentioned in terms by anyone at any point during the entire lengthy discussion of the legislative background, legislative history of the ACA. So we think that, in fact, it is sort of inarguable that Congress simply did not have short-term limit duration insurance in mind when it enacted the ACA. And we think it is particularly unlikely that Congress intended by using a cross-reference to a definitional provision in another statute, which contained an exception for this very obscure niche product, that Congress meant to authorize the agencies, as they did in this case, to tease upon that as a mechanism for creating an entire new form of primary insurance, a novel form of primary insurance never before used in the market, that could be used in competition with ACA-compliant plans that would be designed, expressly was designed to draw millions of people out of those ACA-compliant plans. And out of what Congress had established in the ACA as a single risk pool. When Congress enacted the ACA, it had particular goals in mind, and it wanted to achieve those goals in a particular way. And what it wanted to do- Before we get to the goals, just on ratification, usually a lot of these ratification cases involve agency interpretations that are informally expressed through practice. You talk about Brown, that was a case in which the agency had been on both sides of the same question. Here we have a regulation with the force and effect of law. As Judge Griffith said, there's a presumption that all of us know what the law is, which would seem to cover regulations as well as statutes. So, I mean, is there any case where a court has declined to ratify based on the ground that Congress just didn't know about the interpretation? Where the interpretation was embodied in a binding regulation itself with the force and effect of law? Well, I think that Brown is, in fact, such a case. I mean, the Supreme Court specifically referred to the regulation. And I think that, as this court has said in cases like Public Citizen, that the principle of ratification has to be based on the understanding that- The government's argument for ratification has little weight absent some evidence or reason to assume congressional familiarity with the administrative interpretation at issue. And here, for the reason that I suggested- Yes, excuse me. Finish your sentence. I'm sorry, Your Honor. No, the reason that I suggested- I'm sorry, Your Honor. I'm apologizing for interrupting you. Please finish your sentence. Oh, I appreciate that. I think for the reasons that we have been discussing, I think that the reality is that Congress had no concept of the existence of this regulation at the time the ACA was enacted. It was a very, very, very small part of the health insurance market. It was a niche product. And, you know, at the time that Congress enacted the ACA, nobody had it in mind. Again, the ACA had a very, very lengthy legislative history and background. There was, so far as I can determine, no discussion of SDLDI insurance at all. All right. Let me ask you then, is your basic argument that necessarily Congress' establishment of the single pool provision means that Congress could not have intended the type of interpretation that is urged upon us in the district court's opinion, which makes no reference to this particular provision of the statute? And I gather from your brief, was not mentioned by the government in the district court. Namely, this section 18-032, subsection C. Yes, Judge Rogers, we think that our conclusion follows necessarily from that provision. That's not the only thing that we rely on. We think that the government's interpretation is inconsistent with a number of elements of the ACA. But it is certainly inconsistent with that one. Because Congress, the entire theory of the ACA was that all policies issued by an insurer should be in a single risk pool. That was a way of avoiding adverse selection. It was a way of making it impossible for employers to cherry pick young and healthy people who would get lower prices. And as a consequence, segregating into their own much more expensive policies, older and sicker people. That's why I focused my question on the statutory provision. Since all of your theories, as I understand it, rest on that basic provision that Congress included in the Affordable Care Act. And I understand the other argument. But Judge Griffith, as I understand it, is pointing out that there is a direct reference here in the Affordable Care Act. So it's not as though the limited insurance provision is something that was on the books but simply unmentioned entirely by Congress. So given that it was, however limited the reference may be, I think for me at any event, a lot of these arguments about it was such an unimportant provision that Congress couldn't have really been serious. I understand those arguments, but I'm trying to understand the argument in terms of the statutory provisions that Congress actually enacted. If I can answer that question in reserve, Mike. Yes, please answer the question. Yes, and if I can reserve the remaining time. The phrase short-term limited duration insurance, in fact, does not appear anywhere in the Affordable Care Act. What appears in the Act is a cross-reference to the definitional provision of individual insurance, which appears in the older HIPAA statute. And so Congress simply did not have STLDI in mind at all at the time because it did not use that term. It does not appear in the text of the statute at all. And so I think that it is entirely reasonable to think that Congress simply did not have it in mind and did not need to say anything. I'm sorry, did not have STLDI in mind? At the time that it enacted the ACA, correct. Every major insurance reform in the ACA, the community rating, the guaranteed issue, free existing condition span, they all have cross-references to the individual health insurance provision of HIPAA, which as a matter of definition excludes STLDI. That is correct, Your Honor, but I guess I would say that if we're talking about the ratification doctrine, then the question is whether or not Congress had in mind the rule that is said to have been ratified. And the cross-referencing definitional provision that excludes STLDI, when STLDI was not itself mentioned in the course of the entire legislative background of the ACA, it makes it very unlikely that Congress actually had in mind STLDI itself, let alone the regulation interpreting it that was on the books at that time. I want to make sure I understand your argument. Is the trust of your argument that the purpose of the ACA was to create a single risk pool and that the STLDI rule works across purposes with that? Is that the gravamen of your argument? That is one of our arguments. That is correct. Congress created several exceptions to the single risk pool, didn't it? This wasn't the only one. It created an exception for fixed indemnity insurance. It grandfathered plans. So I don't think it's a fair reading of the ACA to say that it was creating a single risk pool. It certainly was trying to create one very large risk pool, but we have at least two other exceptions with the fixed indemnity insurance and the grandfathered plans. What's so wrong about having a third under the reading of the STLDI rule? It created a single risk pool for essentially all primary insurance, all insurance that people would purchase as their principal form of health insurance. And the fixed indemnity insurance that Your Honor mentioned does not fall in that category. What about the grandfathered plans that do? Well, those were expressly accepted from the single risk pool as a transitional phase. And as Congress expressly recognized, the idea was to move everybody towards ultimately a single risk pool that there would no longer be grandfathered plans. And so Congress expressed that, you know, the express exception that Congress included in the ACA to the single risk pool. The problem with the rule that's been adopted here is that it creates an entire new form of primary insurance that's going to be sold in competition with the ACA compliant plan. We'll draw literally, I mean, the departments themselves acknowledge, we'll draw millions of people out of those plans. And therefore, on the face of it, frustrate the central thrust and purpose of the single risk pool in a way that these other sort of marginal and non-primary insurance plans do. In fact, the rule hasn't destabilized the exchanges, has it? Well, it depends what you mean by destabilized, Your Honor. I mean, the departments themselves recognize that it will draw more than a million people out of the ACA compliant plan. It will drive up the price of those plans. How much? It's a modest increase, right, over the next 10 years or so? The departments predict that it will be a 5% increase. You know, the other estimates are different and larger. For people who are living on the margin, 5% increase for an expensive product like health insurance makes a big difference. And so I think there is no question that it will draw significant numbers of people out of the ACA compliant plans, make those plans more expensive, make it more difficult for people who rely on those plans to purchase them. You say it will draw them out because people will make a choice that they would rather have this more limited form of coverage. That's correct. It will draw those people out. Because it will cost less for them than purchasing ACA compliant insurance. Is that the argument? I think that is correct. It will draw them out because it is cheaper. Now, I think our understanding is that Congress, when it enacted the ACA, it believed that all plans in the individual market should have minimum essential benefits and other protections which were designed to combat the problems that had plagued the health insurance market prior to the enactment of the ACA, which meant that many people who ended up... destabilized the exchanges because so many folks in these exchanges are having their premiums subsidized. I think that is a misleading argument, Toronto, because first of all, there are many people who buy their insurance, ACA compliant insurance off of the exchange and therefore they don't get subsidies. But even for those who do get subsidies, for many of these people, they are partial subsidies and often a very, very small portion of the subsidy. And we make this point and give some of the statistics in our reply brief on this. And so these people are going to remain highly sensitive to price. And price increases, even a 5% price increase, could make quite a substantial difference to people in this category. That's fair. Oh, just one more. Is this Judge Cassis? Yes. Just one final question. I'm sorry? Please continue. One final question, which is, that account has some force to the extent we're focused just on the line between the category of people who have compliant insurance, whether through an exchange or otherwise, as opposed to the less generous but less expensive package that comes with STLDI. But don't you also have to focus on, right, there's another category under the Affordable Care Act, which is people who are lawfully uninsured. And that included everyone who was within the exemptions to the mandate and the exemptions to the penalty. Now that the court has told us that the mandate is really a tax, right, there's a lawful option not to buy health insurance. And there are a lot of poor people, given the court striking the Medicaid expansion, right, there are a lot of people below the poverty level who don't qualify for Medicaid, who don't qualify for the subsidy. If you focus on the line between STLDI and lots of people who would otherwise just be uninsured, why doesn't it look like a pretty good option? Because you might be drawing some people from the exchanges, but you're going to be drawing a lot of people in who would otherwise just be lawfully uninsured. Well, I think Congress had in mind the possibility that some people would regard ACA-compliant insurance as being too expensive. And it addressed that in its own way. It did it by providing subsidies, and it did it by requiring that all the insurance policies be in a single risk pool to keep the price down. I mean, Congress was aware of this, and it chose to structure the ACA in the way that it did. Inevitably, if one takes the approach that the departments have done here, it will draw people out of the ACA-compliant plans who otherwise would have been in them. And again, the departments themselves say that more than a million people who would have been insured under the ACA now will take STLDI insurance instead. And so it's going to draw people out of the comprehensive high-quality insurance that Congress wanted everybody to have, and it's going to put them into something which is inadequate. And the fact is the STLDI regime replicates all the problems in the insurance market that had existed prior to the enactment of the ACA, which are described in alarming detail in the briefs that are filed in this court, the amicus briefs by the American Medical Association and the American Cancer Society, other leading groups of physicians and patient advocacy organizations. So it's going to recreate all the problems, replicate all the problems that Congress meant to sweep aside when it enacted the ACA. So I think that's what Congress had in mind. It was aware that people might forego payment of the mandate penalty, even when it was applied. And nevertheless, this is the structure that we want to have. We want to draw people into high-quality comprehensive insurance. And that's what we want to do. Oh, I'm sorry. Okay. I'm fine. I'm sorry. I know that I'm well over my time. Well, we think this case deserves adequate questioning, and I don't want to cut Judge Katz's off. No, it was just a follow-up, which is it just seems very odd. If you focus on the people who are below 100% of the federal poverty line, they're not eligible for Medicaid, at least in many states. They can't possibly afford compliant insurance without the subsidy, which they're not eligible for. Their choice is STLDI or nothing, and it's a little bit odd to impute to a Congress that wants people to get more insurance rather than less to force those people into the option of nothing. That is perhaps not a question. That is a statement of fact. And I think let's hear from the government, and we'll give appellants time on rebuttal. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Daniel Wink for the government. When Congress passed the Affordable Care Act, it incorporated the existing definition of individual health insurance coverage, which explicitly, in bright flashing lights, excluded short-term limited-duration insurance. In doing so, Congress approved as permissible the definition of short-term limited-duration insurance to departments that applied for more than a decade. The departments left that rule, that long-standing definition in place, under the ACA until 2016. They didn't see it as foreclosed by the single-risk pool provision. And to see why, I think you only have to look at the text of that provision, which is in 42 U.S.C. Section 18032C1. A health insurance issuer shall consider all enrollees in all health plans, other than grandfathered health plans, offered by such issuer in the individual market, including not through the exchange, to be members of a single-risk pool. So right there in the text of the single-risk pool requirement, Congress is explicit that the single-risk pool requirement applies only to plans offered in the individual market, which, again, in bright flashing lights, Congress excluded short-term limited-duration insurance from that plan. So is this argument in your brief? It is in our brief, Your Honor, yes, that the single-risk pool requirement is limited to plans offered in the But this argument regarding 18032C1? It is, Your Honor. It is in our brief. Where would I find that? Give me a moment. I'll give you a page site. Because I did not find it in the district court's opinion.  All right. So in Altman, this court accepted a very similar ratification argument, and there's some confusion in the reply brief on Altman. I think it's worth taking just a moment to talk about what Altman said. So in Altman, the SEC had a longstanding rule that allowed it to discipline attorneys practicing before the commission for unethical or improper conduct. Congress incorporated that rule in the text of a statute. And the question in Altman was not, as the reply brief suggests, whether the rule itself was permissible, but whether the agency's longstanding interpretation of that rule to allow discipline for violations of state rules of professional conduct was permissible. And the court said that when Congress adopted the rule in a statute, it impliably approved as permissible the agency's longstanding construction of that rule. And it didn't, in doing so, point to any hard evidence, you know, for example, a mention in legislative history of the agency's interpretation. As Mr. Rothfeld acknowledged, the standard here is not whether there is hard evidence. That would be the standard if we were making an argument that Congress had impliedly mandated the department's longstanding construction of the short-term limited duration provision. Rather, because our argument is simply that Congress approved the longstanding construction as permissible, the question is whether there is reason to believe Congress was aware of that interpretation. And here, just as in Altman, there is ample reason to believe Congress was aware. Again, Congress chose to draw the definition of individual health insurance coverage from the existing definition of the Public Health Service Act. On its face, that definition excluded short-term limited duration insurance. The exclusion was not buried in some cross-reference or in some ancillary provision. And the scope of that exclusion had been defined by the department for well over a decade. So, just to add to your counsel so I'm clear, I read your argument on page 30 where you quote the language that we're discussing, although you're quoting a different subsection and not the C1 you were talking about today in argument. I thought the issue that the appellants had raised was that, sure, Congress left the choice to persons who would otherwise either have to enroll in the ACA or enroll. Your Honor, I apologize. I'm actually not able to hear your question. It tailed off. I'm not sure what you think here. I heard the very beginning of the question and then I lost you about ten seconds in. I'm sorry for the difficulty with this format. Your Honor, at this point, I'm unfortunately not hearing anything. Hello, Ed? Yes, now I can hear you. I can hear you, Judge. Could you hear me before? No, I could not hear you for a few minutes, but I can hear you again now. And I can as well. All right, let me see if I can condense this. What I'm trying to understand is I understood your argument to point out, although you were quoting a different subsection of 132032 in your brief on page 30, to make the point that Congress did leave a choice to persons who would otherwise be required to get what I'll call an ACA health plan, either off the exchange or the other way. Congress left that choice, but said if you take that choice, then you will end up paying a penalty. Now, if you can cobble together an insurance program that's satisfactory to you as an individual, fine. And we've had cases where people have enrolled in the National Guard when they have health problems on the horizon, get their coverage, and then when they're not covered, they get a short-term policy. Do you see any difference between that effort where the economics that Congress was presented with was such that unless as many people as were eligible were essentially required to join the ACA or pay a penalty, that allowing a short-term policy that lasts for three years is inconsistent with that where the government acknowledged that this would draw out millions of otherwise eligible people?  I understand the notion that there's always been health care insurance that's short-term, but that doesn't necessarily mean that the health care system has been satisfactory to Congress. So Congress comes along and passes what it thinks is going to provide a better system and says, of course, you have a choice, but you have to pay a penalty. Unless you fall within one of these limited exceptions. So a couple of points, Your Honor. First, just to look at page 30 of our brief, we were offering a couple of distinct responses to the argument plaintiffs are making about the single risk pool requirement. So I was looking for C1 and I don't see C1, but I'm not going to fuss about that. I get their argument, but I just want to be clear that that was not what you were arguing in your brief. That's all. And C1 comes in another context. But let's move on and just deal with the question. Judge Rogers, can you hear me? This is Judge Griffin. I'm trying to speak with counsel for the government here. Yeah. Can you hear me? I was dropped from the call for about five or six minutes, and I want to make sure that I'm back on it now. Yes, I can hear you. Okay. Nothing happened in those five or six minutes. Okay. Neither. So just to look, I was dropped from the call. I tried to get back in, and I was on a permanent mute, and I don't know. I'm not on the screen anymore. I'm just by the phone. It's kind of a mess. But anyway, I'm back here. Is there a question pending, or can I ask one with fear that maybe it was covered while I was gone? Your Honor, Judge Griffin, there is a question pending from Judge Rogers, which I'm happy to address. First, Judge Rogers, in five seconds only, the bottom paragraph on 30 does address 18032C1. So we are making the argument in the brief. On your broader question, it's true. Counsel, I'm looking at page 30, all right? And I'm looking at what your argument says, all right? And the point we were addressing earlier is not that argument. But I'm willing not to focus on that and deal with the merits of the point, all right, that you're making. That's right. So can you respond to my question about if Congress has the economics of a healthcare system before it, where it sets up a system that it leaves choice, but it's choice that has a penalty associated with it? Yes, Your Honor. So at the time Congress enacted the Affordable Care Act, it believed, because it had been told by the Congressional Budget Office, that millions and millions of people would not acquire comprehensive coverage. That included some 4 million people who would choose to pay the penalty rather than acquiring comprehensive individual coverage. It also included some 14 million people who were exempted from the penalty. So even at the time Congress enacted the ACA, most of the millions of people it didn't believe would acquire comprehensive coverage were people who were exempted from the penalty for one reason or another, including because of low income. That said, the elimination of the penalty has not altered the basic economic framework for incentivizing comprehensive coverage in the individual market, which is the subsidies. It remains true today, as it did at the time of the enactment of the ACA, that the vast majority of people who purchase insurance on the exchanges qualify for a subsidy to do so. That in many cases, that subsidy covers the bulk, if not all, of the cost of comprehensive plan. And this is an essential point in view of what... Counsel, counsel, counsel. Yes, Your Honor. I just want to get the focus on the economics did identify a number of people who would be exempted, either because of specific provisions in the ACA, or for some of the reasons you're suggesting. As I understand, part of the argument here is that now, if the rule is allowed to stand, it's saying that Congress also contemplated setting up a system that would draw many more millions of people out of the health system that Congress thought would provide better care. I'm just trying to understand that at the time, Congress acted as distinct from what the Supreme Court said thereafter. So what Congress did in the ACA, Your Honor, was to preserve pre-existing exceptions from the requirements for individual market coverage. Those include not just the exception we're discussing today for short-term immigration plans, but also the exception for things like fixed indemnity insurance, which this court addressed in Central United. I think Central United makes an important point, which is that the exceptions in the ACA are as much a part of the ACA as the ACA's requirements. So Congress was well aware that it was maintaining these alternative coverage options, and that it was doing so in view of the fact that it didn't expect for millions and millions of people to acquire comprehensive coverage in the individual market. And since the time Congress did that, as one of the colleagues earlier noted, the Supreme Court, by interpreting the Medicaid expansion as optional, created an additional set of millions of people, low-income Americans with incomes below the poverty line, some 2.3 million people who cannot possibly afford insurance in the individual market without subsidies and who may, in many cases, have no coverage options other than short-term limited duration insurance. So we think the rule is entirely consistent with Congress's design in the ACA. And I would just note that not only did the departments reasonably expect that this rule would have no destabilizing effect on the individual markets, but it has turned out to have no destabilizing effect on the individual markets in the more than a year since it has been in effect. The benchmark premium in the individual market has actually fallen in each of the last two plan years, both in 2019 and in 2020. In Texas, which is... In the Fairness Council, that data is not part of the record. All right? Let's just deal with your other arguments, which I think, you know, have a lot of strength, have considerable strength to them. But I need to understand them. That's all right. So you're saying that the 2016 rule is entirely consistent and that given that Congress preserved all these exceptions, the fact that there are a lot of other people drawn out of the system, there's nothing inconsistent with what Congress anticipated. Is that your basic argument? That's right, although I would note the 2018 rule and not 2016. But the key point about drawing people out... First of all, Congress didn't expect... The departments didn't expect and plaintiffs' own projections don't anticipate millions and millions of people to be drawn out. What the projections, both the departments and others, including plaintiffs, anticipate is that the rule may cause some reduction in the number of people who have minimum essential coverage to the individual market, but that it will increase the overall number of people who are covered by some form of insurance. And that's an essential point. The department's judgment was that it was more important for a greater number of people to have some form of coverage than to give people an all-or-nothing choice between comprehensive coverage and no coverage at all, with the cost of causing a greater number of people to have no coverage at all. It's an essential point. And on the economics of this, I think one point that's critical to understand, Mr. who are at the top end of the income range for subsidy eligibility, the subsidy itself may not be very high, but that importantly does not mean that those people are any more price sensitive than anybody else who's eligible for subsidies to changes in the benchmark premium. The way the subsidy formula works, and this is in Section 36B of the tax code, is that it defines the subsidy as the excess of the benchmark premium over a specified percentage of the individual's income. So even for somebody who has today, for example, a $13 subsidy, which doesn't cover very much of the cost of the plan, if the benchmark premium increases by $100, that person's subsidy will go to $113. So critically, for anybody who's subsidy eligible, which is, again, 87% of people who buy insurance on the exchanges, those people are completely insensitive to changes in the benchmark premium. So that's why there is no risk of a death spiral from modest changes in the benchmark premium, even if the rule induces some relatively modest number of people to leave the individual markets because they're not subsidy eligible or because the subsidy covers a small amount. There's no reason to believe that increases in the premiums will cause an accelerating migration out of the individual market, which is a death spiral. And that's the only relevance of the more recent data, is that, in fact, there's been no such death spiral or anything close to it. The markets are healthy and stable. And I think that's relevant, even though it's outside the record, in that it validates the reasonableness of the department's expectations at the time they enacted the rule. Mr. Wink, I'm sorry. I'm sorry, Judge Rogers. Go ahead. I'm sorry. Who is this? Judge Griffith? Yeah, Judge, go ahead. I'm sorry. Do you want to finish your question, and then I'll come back? No, you go ahead with yours, and then I'll come back. Counsel, what would your response then be to Appellant's argument that the judgment the department has made is one for Congress, and there's no indication that Congress delegated that kind of basic judgment to the department? The judgment the departments have made, Your Honor, is well within the scope of what Congress delegated. The judgments that departments have made is about the scope, is about the definition of short-term immigration insurance, which is a category of insurance Congress defines as without placing any definition at all on what that phrase means. So the departments had to define that phrase. This isn't a mousehole or an elephant. I mean, the phrase is left completely undefined by statute, and so the departments do have delegated discretion to define it, nor is this remotely the source. Except, I just want to, it did use short-term limited. Correct, Your Honor, it did, and that's the text the departments have reasonably interpreted. But Congress was fully aware, of course, of how to say, you know, three months or six months. It did that in other provisions of the statute, as in many statutes, and it didn't do any such thing here. So I think there's no question that Congress intended the departments to define the phrase short-term limited duration insurance. And for the reasons we explained in our brief, we think their construction was eminently reasonable. Thank you. Judge Griffith? Yes. No, no, no, no. We're all laboring with this technology, which is new to us, but remarkably helpful given the circumstances. Thanks for your patience. Counsel, I've got a couple of questions. How is the STLBI policy short-term or limited in duration when the rule itself acknowledges that consumers can string them together, making them functionally infinite? I know the policies are technically capped to three years, but can't consumers string them together so that there really is no end to them? It's possible, Your Honor, for consumers to buy what are essentially option contracts, right, an option to buy another health insurance policy in three years. The rule doesn't make any change to that possibility. It was lawful under preceding law. It's lawful under this rule. In the 2016 rule, I think it's worth noting, the departments had been asked to limit the both on the ground that a restriction would be unwarranted and on the ground that it would be difficult, if not impossible, to enforce because there's no national registry of who is a subscriber to which insurance plans at which time. But under the 2016 rule, it was true that the Kaiser Family Foundation report notes that we said in our brief people would buy four packs of insurance coverage, a three-month insurance plan with an option to buy successive three-month plans at six and nine months down the road. So we don't think that in any way changes the validity of the department's construction of the limitation, which does apply to a single policy. The departments have required that policies sold under this exception be both short-term and limited in duration, short-term in that they're shorter than the term of the standard insurance plan and limited in duration in that they're not renewable at the option of the insured and that they're limited to three years total in duration. That interpretation of the phrase was, I should note, embraced not just by the departments but by many, many states. In the immediate wake of HIPAA, it was endorsed by the NAIC, the Association of State Insurance Regulators, who opposed the 2016 rule and supported this rule. And they did that because this rule makes sense. It protects consumers and it advances the purposes of the ACA as it did the purposes of HIPAA. Okay. Let me ask you to respond to some questions that Mr. Rothfeld gave in response to questions I asked him. So under King v. Burwell, it looks like, at least for the purposes of the ACA, we are all purposed to this now, right? We're supposed to look to the purpose of the ACA. And I asked him a question, you may recall, about whether it really was the purpose of the ACA to create a single risk pool in light of exceptions for fixed indemnity insurance and grandfather plans. What is your response to that? I mean, as I recall, he said those fixed indemnity insurance really isn't a primary insurance – isn't a way to cover yourself primarily – primary insurance policy. And so that's – it's of a different sort than the STLDI policy would be. What's your response to that? Our response on the single risk pool provision, Your Honor, is based on the text of that provision, which says, a health insurance issuer shall consider all enrollees in all health plans other than grandfather health plans offered by such issuer in the individual market, ellipsis, to be members of the single risk pool. So the provision is limited by state to individual market plans, which, again, Congress explicitly excluded short-term plans from the individual market. So the provision is just irrelevant here. Congress made clear that plans of this nature are not sold as part of the single risk pool. Where, then, do the fixed indemnity insurance plans fall in? What category am I supposed to put them under, as I'm thinking about this? Fixed indemnity insurance is a form of an accepted benefit, which is excluded – Those exclusions are in 42 U.S.C., 300 G.G., 21 C., and 300 G.G., 63. So it's a different category of plans that are excluded from individual market requirements, but just like short-term limited duration insurance, it's excluded from individual market requirements. And, again, as this Court said in Central United, by incorporating – by carrying forward that existing exception, Congress intended to make such plans available on an ongoing basis, and that decision has to be respected. Again, the exceptions from the ACA's individual market requirements, the Court said in Central United, are as much a part of the statute as the requirements themselves. So we think plaintiffs are offering essentially the same type of argument that the Court rejected in Central United, which is that the availability of a type of insurance protected by Congress, maintained by Congress, should be curtailed to advance Congress's ostensible purposes. We just don't think Congress's purpose was, as plaintiffs suggest, to provide an all-or-nothing choice between comprehensive coverage and no coverage at all. Had Congress intended that, it would have, as it very easily could have, eliminated the exceptions for short-term plans and fixed indemnity insurance. Okay. Thank you. I'm happy to address any further questions the Court may have. Otherwise, we will rest on the brief and ask that the judgment of the District Court be affirmed. Your Honor, this is Charles Roth. If I can speak a little bit on rebuttal? Yes, of course. Just a couple of quick points. First, on the question that Mr. Vinnick raised about whether this is an elephant in a mouse hole, we think this clearly runs afoul of Justice Scalia's admonition that Congress does not put elephants in mouse holes. What the rule does here is create an entirely new form of primary insurance that had never previously existed. Mr. Vinnick suggested that our reference to millions of people is not accurate. I have to disagree with him on that. The President's Council of Economic Advisers itself predicted that a million people would leave ACA-compliant insurance for SDLDI within the next year. Departments themselves predicted that that would happen in a somewhat longer period of time. So there is no question that the rule is going to have the effect of creating a form of primary insurance that had never previously existed. SDLDI, at the time of HIPAA's enactment and at the time of the ACA's enactment, was used exclusively as a form of transitional insurance. It was not used as primary insurance. What the rule does now is redefine it in a way which makes it operate for the first time exactly as practical matter in the same way as comprehensive primary insurance does. It operates and lasts for as long as a year. It can be renewed for up to three times. As Judge Griffith noted, it can be kind of stacked so that it lasts forever. That is a completely novel use of SDLDI. And it will restructure the insurance market in a very fundamental way that will have a profound effect on the lives of millions of people, both those who are buying SDLDI and those who are paying higher prices for their ACA-compliant insurance. I think that, as Justice Scalia pointed out, this is not the way that Congress operates. When Congress needs to give agencies the authority to draw this kind of dramatic change, it does not do it by cross-reference to a definitional provision in another statute that contains an exception to an obscure form of product that had never been used for this purpose before. So I think that this is simply outside the scope of the authority that Congress meant to give the departments. Second, to raise a point also that was touched upon by Judge Griffith, which I didn't really get to address in my opening remarks, which is the language of the statute that is being interpreted here, short-term limited duration. Short-term has to be given a meaning that is consistent with the ordinary usage of that language. Everybody acknowledges that short is a relative term. Short-term has to be short in comparison to the standard term. Everybody agrees the standard term of health insurance is one year. So by ordinary usage, which Congress must presume to use, a plan that lasts for 364 days and 23 hours is not short-term. I mean, our opening brief in this court was 12,997 words. That's three words short of the limit. But nobody, no reasonable person would say that our opening brief is a short brief, and that same principle applies here. Please continue. Just one more quick point in response to a question that I think was raised by Judge Cassis and the Medicaid ruling in the NFIB, and whether or not that has some bearing on the interpreted question here. Congress was well aware of that ruling. There was extensive debate about what should happen to the ACA both before and after that ruling. Probably no subject has gotten more attention in Congress over the last 10 years in what should happen to the ACA. There have been repeated proposals to change it in response to NFIB to repeal it altogether. Congress has refused to take any of those steps. And so what the departments are doing here is stepping in to do something that Congress refused to do. They are rewriting the statute in ways that Congress initially considered and chose not to do, Congress was presented with and chose not to adopt. And that is something outside the authority of agencies. When Congress has been presented with and has considered the question and has chosen not to act, agencies cannot step in and rewrite the law in Congress's place. If there are no further questions? Are there any further questions, Judge Griffith or Judge Cassis? Okay. I'm fine. All right. Thank you. Counsel, we will take the case under advisement. Thank you very much, Ron. Case number 19-1163, National Weather Service Employees Organization Petitioner versus Federal Labor Relations Authority. Mr. Hearn for the petitioner, Mr. Peters for the respondent. All right. If counsel will hold one moment while I get my papers in front of me. Okay. Thank you. This is Judge Rogers. Judge Griffith or Judge Cassis, are you ready? Yes. Yes, I am. All right. Counsel, you may proceed in number 19-1163. Good morning. May it please the Court. This is Richard Hearn, and I represent some 3,400 forecasters, technicians, and support personnel at over 150 weather service offices nationwide. In 1987, in United Paper Workers versus MISCO, the Supreme Court held that so long as an arbitrator is even arguably conscruing or applying a contract, a court cannot overturn his award even if it is convinced that an arbitrator made a serious error. But the FLRA is living in a pre-MISCO world, laboring under the misimpression that it can judge the reasonableness of an arbitrator's interpretation of a collective bargaining agreement. Nowhere in the authorities' brief does it deny that it substituted its judgment for that of arbitrator Evans' interpretation of the agreement. In fact, it devoted the last three pages of its brief to argue why its interpretation of Article 29 was more reasonable than that of Mr. Evans. And although the FLRA's interpretation of Article 29 is beside the point, it was arbitrary and capricious for multiple reasons. The authorities said that the union requested the services of the FMCS too early in negotiations, but the authority ignored and never mentioned in its decision Section 16 of the ground rules, which are found on pages 128 and 143 of the Joint Appendix, which reads, either party may invoke the services of the FMCS at any time. Article 29, Section 2 of the agreement, required the parties to negotiate ground rules for their next agreement. And these ground rules were negotiated in accordance with Article 29. The ground rule 16 uses the exact same phrase as Article 29, Section 3, invoke the services of the FMCS. The ground rule 16 negotiated subsequent to Article 29, Section 3, must be read in paramateria with Article 29. The authority also ignored the regulations of the Federal Mediation and Conciliation Service, which directs the parties to notify it and invoke its services at the beginning, not the end of negotiations. And if the purpose of Article 29, Section 3, is to expedite negotiations as the FLRA contends, starting the 90-day termination clock ticking earlier rather than later, advances rather than hinders the goal the authority says that section is trying to achieve. Counsel, can I ask you, I have a hard time understanding Article 29, Section 3. Is it the union's position that the best reading of this termination clause is that if anyone invokes the services of the FMCS or FSIP, that that therefore cuts off the ability of the other side to terminate the agreement? It reads that way to me. Yes, that's the plain reading of it, yes. But then the first sentence makes it sound as if that is just a tolling provision. But if you seek the services of these mediation services, that's just that while the mediation services are involved, that tolls the 90-day clock, and once that period is over, the clock starts running. It's almost like a speed trial act. It sounds like that as well, doesn't it? Well, that is an interpretation that nobody has argued in this matter. And rather than trying to analyze the reasonableness of that interpretation, I think that all part anybody concerned is bound by the arbitrator Evans interpretation of the agreement. And I guess our major point is once arbitrator Evans has interpreted the contract, that's the end of any analysis that must be given to the meaning and term of the contract. I mean – Unless it's patently unreasonable or beyond his authority or something of that nature. Well, beyond authority means he's answering an issue that was not presented to him. Patently unreasonable, I think that that was the – this court has rejected – the Supreme Court and this court has rejected that standard. The Supreme Court in NISCO and in Knoxwood Health Plan and in Garvey all said it doesn't matter how wrong a court may think the arbitrator's interpretation of the agreement is as long as the arbitrator on its face – the arbitration decision on its face purported to interpret the agreement. That's the end of the matter. There was one case from this circuit, and I apologize that I don't know which of the many cases from this circuit, so I don't know how brief it was. But Circuit Judge Kavanaugh wrote a decision where he clearly said the arbitrator's interpretation was wrong and that the court thought it would never have reached that interpretation but was powerless to substitute its judgment for that of the arbitrators. Mr. Hearn, I think your position has tremendous force on the merits of the contract claim, but I wonder if we have jurisdiction over that issue. Why should we – I mean, this is an odd circumstance where you're saying the predicate for statutory – we only have reviewed to the extent this order involves a statutory violation, and the only statutory violation you've alleged is a breach of contract is predicated on violation of the collective bargaining agreement. I mean, you could always turn a breach question into a ULP question, and if you get review of the breach question on the theory that the order involves a ULP, you've just wiped away entirely the principle that an arbitrator's decision on a contract claim is supposed to get one and only one level of review, which is before the FLRA. Well, thank you for asking that question, and we have multiple answers to that. It is not a simple breach that makes it a ULP. It's a repudiation of the entire agreement. Fair enough. Just assume that I think we have jurisdiction to address the repudiation issue because that is statutory. That requires something more than a breach. Why shouldn't we limit our review to the repudiation issue, which is statutory? Here's the answer to that. There are three cases in this circuit that this court reviewed an arbitration decision from the FLRA that involved an unfair labor practice. In none of those three cases was the court's decision on the merits, what the court actually reviewed, the question whether or not an unfair labor practice had been committed. And if I could explain, the first case, the Overseas Education Association case, what the court reviewed in that case was not whether an unfair labor practice had been committed or whether the FLRA had properly found that there was an unfair labor practice or not. That was Judge Starr's opinion? Yes. That's the one I have in mind, and I'll let you walk me through the other two. That was the case in which what we reviewed was the question whether a statutory claim that proceeded on the FLRA charge track was different from a contractual grievance claim which proceeded on the arbitrator track in order to trigger, in order to prevent splitting of claims. That seems to me very different from what you're asking us to do here, which is review straight away the contractual question of breach as opposed to the statutory question of repudiation. I would answer that in the OEA case, it was not – there was no discussion of unfair labor practice law or analysis of whether an unfair labor practice had been committed. But what was reviewed was the interpretation of 7116 of the statute, which precluded subsequent processing of a grievance over the same issue and a finding by the court that it wasn't, as a factual predicate, the same issue. None of that involved unfair labor practice law. And also in that court, Judge Starr wrote that the use of the phrase involves, quote, strongly suggests that something less than a treatment of the merits is required, close quote. So if treatment – if something less than treatment of the merits is required or is acceptable for review, then a fortiori you can have a review of an FLRA decision without any discussion or treatment or analysis of the merits of an unfair labor practice case. But in this case, the two questions are intermeshed, and in fact – and this raises the question of whether the amended decision is considered at all. But in the initial decision, the only basis on which the authority found that there was no illegal repudiation was because they found that the agency was privileged in terminating the contract. That was the only basis that they found there was no unfair labor practice in its initial decision. So with regard to the two other cases in this circuit that reviewed and set aside FLRA decisions in arbitration awards that involved unfair labor practice, the second one is Naval Underseas Warfare Center versus the FLRA at 665 F-1339. In that case, Judge Kavanaugh wrote that the substantive question under review was not some unfair labor practice issue that arose under the statute but whether the arbitrators ordered that the Navy continue to provide its employees with bottled water was consistent with the federal appropriations law. The third case is Department of Commerce USPTO versus the FLRA 672 F-31092 in which a panel of this court, which included Judge Rogers, set aside an FLRA decision affirming an arbitration award based on the law of collateral estoppel… …not involving any analysis of whether there was a statutory unfair labor practice but merely that there was an earlier case that the union lost on the same issue and the union was collateral estoppel from bringing the second arbitration case that the court set aside. In each of these cases, the finding that a ULP was involved in some way merely opened a door to reviewing the FLRA's decision on some basis other than whether the ULP had been committed. And the ultimate issue the court decided in each of those three cases did not involve the law of unfair labor practices. And there is no authority, and the authorities cited no authority that said that once the court has jurisdiction over the review of the case because it involves an unfair labor practice, it is limited to reviewing only part of the decision. And finally on jurisdiction, even if 7123A1 does not provide this court with the jurisdiction to review the entirety of the authority's decision, we believe that the court has jurisdiction to do so under both Levy v. Kine and this court's decision in custom service versus FLRA at 43 F-3682. In that case, this court found that there was no unfair labor practice involved in the arbitration award it set aside. But it set aside the award on the grounds that the FLRA exceeded its jurisdiction by affirming an arbitration award or by reversing an arbitration award. That involved a grievance that was outside the scope of what the statute defines as a grievance. It was a quasi-jurisdictional basis that the court set aside the FLRA decision. And I think it's – as we view this, this is clearly a jurisdictional question of whether the authority has grounds to set aside arbitration awards under the statute on something other than the private sector standard as defined by the Supreme Court. It goes directly to the FLRA's jurisdiction, and therefore we believe they've overstepped their jurisdiction by using a basis other than that which is approved by the circuit and the Supreme Court in the private sector. So I – and I have now – I have not yet addressed whether or not – why we still think there is an unfair labor practice, and perhaps I should do that in rebuttal unless the court – before I address our thoughts on that now. Just one more question for me, which is, assuming you prevail on the jurisdictional question that we've just been discussing, and assuming we agree with you on the merits of the contract claim, right, if we get that far, do we need to reach the ULP question? Haven't you gotten full relief at that point? Well, a certain additional relief comes with the unfair labor practice question, including – would be a mandatory notice and posting of an unfair labor practice as is customarily ordered by the FLRA, an email from the agency head to the employees transmitting a notice assuring them that no similar unfair labor practices will be committed. There are certain additional remedies that can be provided. Understood. Thank you. All right. So let us hear from the authority, and then we'll give you some time on rebuttal. May it please the court. Noah Peters for the Federal Labor Relations Authority. The union in this case is asking this court to do something that it has never done before, which is to review the merits of an authority arbitration decision that has no bearing on the law of unfair labor practices. This is a question that this court has considered for over 30 years, and it has consistently held that, for example, quoting the AFG 2006 decision at page 505, 506. It talked about a case in which the authority's order addresses both an unfair labor practice and an attorney's fees issue. It said, in that case, the rationale for review of the order would obtain to the extent and only to the extent the unfair labor practice was involved. Or, for example, in the custom service case, which is cited by the union, 43 at 3rd at 686. We have recognized that the merits of an arbitrator's award that implicates only the collective bargaining agreement are, by virtue of the categorical nature of 7123 and its bar on judicial review of authority arbitration decisions, absolutely immune from judicial review. This is an integral part of the statutory scheme, the review scheme that was created by Congress, and there is no warrant for reviewing the authority's order to the extent that it involves pure issues of the authority's review of the arbitrator's decision. I understand the force of that point, and the potential of this theory to unravel a decision to subject arbitrator decisions only to FLRA review. But, on the other hand, how in the world could we say that this case, we have reviewed to the extent the order involves a ULP, and you all have settled authority which allows a complainant to say that a breach of a collective bargaining agreement is the ULP. And that's the theory that they've invoked here, so we literally cannot possibly assess whether there's a ULP predicated on a breach of a collective bargaining agreement without looking at the question whether there was a breach of a collective bargaining agreement. Sure, and so the answer to that will depend on ULP law to some extent. And so the court looked to ULP law, and it finds that as long as the agency is acting under reasonable interpretation of the contract, it is not committed a ULP. Fortunately, in this case, the union does not even argue that the agency's interpretation of this termination provision was unreasonable. It's not an argument that it could make. So to that extent, the court would apply ULP law. It would find that ULP law says not every contractual breach is an unfair labor practice. It has to be unreasonable, and that's been the authority standard for decades. It's been the NLRB standard for decades. So it applies that law, and it finds that there's not even an argument that this is unreasonable, that the agency's interpretation was unreasonable. And that's really the end of the matter. I mean, you can also look to the fact that, of course, there was no repudiation of the bargaining arrangement with the union. So just so I understand, in the course of deciding the ULP statutory question, you would permit us to determine whether the employing agency's position on the contract was a reasonable one, which is the statutory question under your repudiation law. We could decide whether their view of the contract was a reasonable one, just not whether it was a correct one. Yes, I think that that's right. I mean, so the ULP issue is whether there was a repudiation, ultimately. So whether the agency acted under a reasonable interpretation of the contract, which, again, isn't really an issue in this case, I would argue, because there's no claim that it was unreasonable. But yes, to that extent. But again, the guideposts here have been set by this court for decades. For example, the OEA case, where it said that the conduct at issue must actually be characterized in the claim pursued by whatever route as a statutory unfair labor practice and not as something else. So to the extent this claim has been pursued as a statutory unfair labor practice, the court can resolve it as a statutory unfair labor practice question. It can review whether the authority has correctly applied ULP law. And so it would look to such factors as to whether there was a repudiation in the context of this agreement. It can look at, you know, that sort of thing. Am I still on? I'm getting weird noises. You are still on. Okay, good. So yes. So to the extent that the circuit is reviewing the ULP issue, then of course it can pass on the fact on whether the agency acted in accordance with a reasonable interpretation of the contract. And I think there's no question that the interpretation of the contract here was reasonable and that under the circumstances, the authority's conclusion that there was no ULP, it was a reasonable one. It wasn't an arbitrary capricious one. It wasn't not in accordance with ULP law. And again, as your Honor pointed out before, if this is the opposite and if there is a way to get kind of factual review of the totality, not just of the contract issue, but also of arbitration law just writ large, you know, This would mean that in any case, if you tack on a ULP claim to a contract claim, you get plenary full-blown review of the entire case. You get a review of the merits of the authority's application of the standard review that's clearly directed towards it. And you get plenary review. And the courts have consistently said that indirect review of a contractual holding, of an authority contractual holding, is not permitted because the language of 7123 is clear. That judicial review is permitted only to the extent that ULP law is addressed. So to the extent arbitration law is at issue. And to the extent that there's a question of arbitration law, which there was in Act 2007, even a question of arbitration law that blocked the ULP from even being considered by the court, that was beyond the court's jurisdiction in the Act 2007 case. And that's been the court's consistent statement on the jurisdictional question for 30 years. A couple of the cases that were just cited, I don't believe were in the union's brief, such as the USPTO case. And I don't believe the Bottled Water case was either. But the OEA case is fully consistent with our position today. In that case, the question was whether a previous required substantive evaluation of ULP law. Or at least of an unfair labor practice to see whether an unfair labor practice had properly been presented by a later case. And whether it was barred by different doctrines. There's never been a case where the circuit has just kind of writ large reviewed the authority's application of arbitration law. And reviewed the authority's application of this essence standard, which is, again, directed towards it. And there's also a question, the question of whether the authority has applied the essence standard in a matter that's just as deferential as a circuit court would have applied it. Is, again, would pretty much open the door for unlimited plenary review of the authority arbitration decisions. Because there would always be a question of whether the authority had been deferential enough. Whether it had been too deferential. That's precisely the sort of fine-brained, you know, purely subjective question that is completely beyond the bounds. That's something Congress intended to close the door to and say, you get one shot at review of an arbitrator's award on arbitration law. That's before the authority. To the extent ULP law is involved, you get it reviewed in the D.C. circuit. But we want to ensure that this remains quick and final. We don't want to tack on an additional layer of judicial review in the D.C. circuit. And the way to respect that is to put in force the language that Congress used in 7123. And I do want to address the point of Leadham v. Kine. So we brought up Leadham in our brief as an example of the fact that the authority had not made a sort of grievous error. Of course, Leadham v. Kine only applies to district court jurisdiction. It doesn't apply to appellate court jurisdiction. And so there is to the extent that the union attempts to make hay out of Leadham v. Kine, it ultimately must be unsuccessful in this case. Hello? Do you want to address the issue about what is before us in terms of the authority's initial decision versus its amended decision? Sure. The fact is that every, you know, the authority has, this court's jurisdiction under 7123 becomes exclusive upon the filing of a certified record. And every tribunal, whether administrative, judicial, has an inherent authority to try to get it right. There is a public interest in allowing the agency to try to reach a right result, to try to streamline judicial review. And that's what the authority did with it was to issue an amended decision before the filing of the certified index, which includes a more fulsome discussion of ULP law, which, again, is an attempt to address the court's concerns about delay and unfair prejudice and ensure that there will be a fulsome decision, a complete decision, a complete record for this court to review. And that is the circumstance in this case. To ignore the amended decision, the only advantage to the union in that case is forcing the agency to litigate on an incomplete record, to possibly force a remand that could otherwise have been avoided had the amended decision been considered. So the union is left to argue for a position that could only result in more delay and more prejudice, which is forcing the agency to litigate on a concededly incomplete record, to force the court to decide the case on an admittedly incomplete record without the agency's more fulsome views on the ULP question. What is the prejudice, then, so I understand it, to a remand? Well, the prejudice would be the delay. I mean, the fact is if the... At whom? The union or the employees? Right. Well, I mean, yeah, I think there's prejudice, too, to the public interest, right, because this forces the agency. If there was a ground, if, for example, the amended decision would have been affirmed, would have been found to be legally sufficient, but the original one was not, then that would force a sort of unnecessary... I mean, it would prejudice the public because it would force an unnecessary remand reconsideration. It would force, you know, the agency to use its limited resources to adjudicate a case on remand that might have been avoided had the court considered the amended decision, and ultimately there is a... Maybe the court, but the court denies the motion to remand. That's what I'm trying to understand. Yeah, and we obviously acknowledge that, but the, you know, the court's concern was delay and prejudice. It said, we don't want to allow a full-blown remand because we're concerned that the case is going to go back for months. We're, you know, it's going to delay things. The union would have to file another petition for review, all of those factors. Issuing an amended decision within a week of that order, before the filing of the certified record, before briefing, which allows for full-blown merits briefing on the issue, which doesn't in any way provide prejudice to the union, and is fully consistent with the concerns expressed in the order, which is we don't want this case to go back into the freezer and sit there for a long time for no good reason. And so we heard it, and so that's why the agency very quickly issued an amended decision in full time for the union to be able to, and for us to be able to fully brief all of the issues in the case. And if there are no further questions, I'll submit. Any further questions? Hearing none, thank you. Thank you. All right, counsel for petitioner? Yes, thank you. We do not believe that the court should consider the rationale in the amended decision, but we will refer to our briefs on that issue and address some of the other issues about whether or not an unfair labor practice has been committed. I think we disagree with the claim that never before has the court reviewed an arbitration decision on some basis other than the law of the unfair labor practice. I will refer back to my opening argument in which we view that in every case that this court has reviewed an FLRA decision involving an unfair labor practice, it has done so on the basis of something other than unfair labor practice law. On the actual unfair labor practice, if we were to examine the amended decision, we think that the amended decision itself is a post hoc rationale that is not even consistent with the authorities or the NLRB's own case law on which the authority relies. And I'm comfortable about categorizing what's at issue in this case as a breach of the agreement. This is a wholesale repudiation of the agreement. The law of repudiation of a collective bargaining agreement takes two forms. You can have a de facto repudiation where a particular breach rises to the level of being patent and goes to the heart of the agreement. And in which case, that's when you look at whether the employer's breach of the agreement was reasonable or not. Or you can have an entirely different variety which is the more traditional where an employer, as in this case, repudiated the entire agreement and denounced and saying that it was not binding on the employer at all. That's the second case. And in those kinds of cases, there were five FLRA decisions where the employer repudiated the entire agreement and the FLRA did not ask whether the interpretation or grounds were reasonable or not. And those cases are the Department of Justice Bureau of Prisons case 68 FLRA 125, Great Lakes Service Center 9 FLRA 499, the U.S. Patent and Trademark Office 18 FLRA 713, the AFGE 21 FLRA 986, and the Department of Defense Dependent Schools 50 FLRA 424. In those five cases, the employer, as in our case, repudiated the binding nature of the entire agreement rather than simply breaching an agreement. And in none of those cases did the authority analyze whether the breach was reasonable or not. And in fact, in the last case, the Bureau of Prisons case, the authority wrote that expressly rejecting an agreement in its entirety will always amount to a clear and patent breach that goes to the heart of the agreement. And so that standard about reasonable or not should not apply when the whole agreement is repudiated. In any of those cases, did the employing agency make the argument that's made here, which is, yes, this provision goes to the entire contract, but we have reasonably construed it? That is not my reading of those cases. Those cases were where the employer notified the union that the entirety of the agreement, that it was not going to follow it, it was not bound by it. And even if one were to look at the reasonableness of the weather services breach in this case, I just want to go back to Section 16 of the ground rules, which was negotiated pursuant to Article 29 and subsequent to Article 29, where the parties subsequently agreed that, quote-unquote, I, the party, may invoke the services of the FMCS at any time. I don't know how you read that out of this package. That one clause should have been the end of the matter, and the authority did not even acknowledge it in its decision, although that was certainly one of our key arguments opposing the agency's exceptions. And whether or not this was a repudiation of a collective bargaining agreement, I can't imagine in 40 years of practicing labor law and in reading all the other repudiation cases from the NLRB and FLRA, I can't see where there was ever a repudiation that was more notorious than this one. Not only was the union given a letter saying we're terminating our contract, every employee was sent an email by the employer saying that the weather service was terminating the agreement. The NOAA, the parent agency, contacted Congress saying that they were no longer going to honor the agreement, that they were terminating the agreement, and they actually put out a press release noting that the Secretary of Commerce had approved the action. I don't know how you can have a more notorious repudiation than what has occurred in this case. All right, anything further? I think we'll rest on that, Judge Rogers. All right. This honorable court is now adjourned until Monday morning at 9.30 a.m. All right, Judge Griffith and Judge Cassis? Yes. Judge Cassis, do you want to set up a conference call? All participants are now in interactive talk mode. We're sorry, your conference is ending now. Please hang up.
judges: Rogers, Griffith, Katsas